## TOMMY LEE WALKER V. STATE

No. 27,390. February 9, 1955
Appellant's Motion for Rehearing Denied
June 1, 1955

Appellant's Second Motion for Rehearing Denied
(Without Written Opinion) June 22, 1956

Writ of Certiorari Denied by Supreme Court of the
United States January 9, 1956, filed in
Court of Criminal Appeals January 19, 1956

*W. J. Durham* and *J. L. Turner, Jr.,* Dallas, for appellant.

Henry Wade, Criminal District Attorney, *James K. Allen,* and *George P. Blackburn,* Assistants District Attorney, Dallas, and *Leon Douglas,* State's Attorney, Austin, for the state.

MORRISON, Presiding Judge.

The offense is murder; the punishment, death.

Mrs. Parker was mortally wounded some time between 8:55 and 9:10 on the night of September 30, 1953, in the vicinity of Love Field in the city of Dallas. The cause of death was a knife wound in her throat which severed her jugular vein. She also received other bruises to her face and body and had been raped. The only question is the identity of the appellant as her assailant. The appellant, a nineteen-year old member of the colored race, was arrested on January 29, 1954, and thereafter made two written confessions in which he admitted that he had seen a woman at a bus stop on Lemmon Avenue and had forced her at knife point to go down into the bed of the creek near the bridge, and that her throat had been cut while he was in the act of robbing her. He did not admit the rape. Appellant's defense was that of alibi, in which he was supported by the testimony of his witnesses and which defense the jury rejected. With this summary as a background, we shall give a more detailed statement of the facts.

Mrs. Parker's employer testified that she left work at 8:55 p.m. and walked toward the bus stop, which the evidence shows is in the vicinity of a bridge on Lemmon Avenue.

R. R. Ryan testified that he saw a young colored man who, in his opinion, was the appellant leaning against a post on Lem-

mon Avenue about one-half a block north of the bridge at approximately 8:55 p.m. on the night in question.

Mrs. Kluge testified that she saw the appellant walking south on Lemmon Avenue in the direction of the bridge at approximately 9:00 p.m. and that shortly thereafter she saw Mrs. Parker also proceeding in the same direction.

Both of these witnesses identified the appellant at a police lineup shortly after his arrest.

Mr. Clarkson testified that at approximately 9:10 p.m. he saw Mrs. Parker in the middle of Lemmon Avenue near the bridge; that he stopped his automobile, asked her what had happened, and she replied that she had been stabbed; that he put her in his automobile and proceeded to Love Field; where he summoned the police and an ambulance; that the trip required three or four minutes; and that the police arrived four or five minutes thereafter.

Officer Gallaher testified that, in response to a call, he went to Love Field, where he saw Mrs. Parker at approximately 9:18 p.m. on the night in question; that she told him her name and address and said, "A negro took me under the bridge and cut my throat"; that shortly thereafter he sent her to the hospital in an ambulance, but that she was dead on arrival.

Captain Fritz testified that he arrived at the scene of the homicide shortly after its discovery; that he found a woman's panties, together with eye glasses and a purse, which were shown to have been the property of Mrs. Parker, under the bridge. He testified further that the appellant was arrested on the night of January 29; that he talked to him two or three times for short intervals; that on January 30 he signed a written confession in which he admitted that Mrs. Parker had been cut in the throat while he was in the act of robbing her; and that thereafter the appellant was transferred from the city to the county jail.

Millard Sweatt, investigator for the district attorney's office, testified that on February 6 he and Henry Wade, the district attorney, interrogated the appellant and that the appellant signed a written confession which, though in slightly different phraseology, was practically identical to that given to Captain Fritz.

The facts will be more fully discussed in connection with the contentions raised by appellant's two able attorneys in their brief and oral argument.

Appellant moved to quash the indictment on the grounds of racial discrimination in the selection of the jury commissioners who selected the grand jury which indicted him and in the selection of the grand jury itself.

As to the jury commissioners, the proof is very similar to that which was before this court recently in Morris v. State, 158 Tex. Cr. Rep. 516, 251 S. W. 2d 731 (writ of certiorari denied), and Addison v. State, 160 Tex. Cr. Rep. 1, 271 S. W. 2d 949. What we said in those cases, we think, disposes of appellant's first contention.

As to the grand jury, we must examine the record further. As in the Addison case, there was no showing of express or intentional discrimination in the selection of the grand juries in Dallas County. Clarence Jackson, a Negro, was a member of the grand jury which returned the instant indictment. It was shown that a Negro had been on each of the grand juries impaneled in Dallas County for the last ten years except three, and that two grand juries had had two Negroes serving on them during that period. There was no showing as to racial composition of the grand jury panels of sixteen names from which a grand jury of twelve was chosen, except that on one occasion three Negroes had been on the panel.

Appellant offered the testimony of two of the jury commissioners who selected the grand jury which returned the instant indictment. Commissioner Hansen testified that he recommended Clarence Jackson because he knew him personally, knew that he was a deacon of the church and a very worthy and trusted employee of the Federal Reserve Bank; that he mentioned to his fellow commissioners that Mr. Jackson was a member of the colored race; and that he found out later that he was the only member of that race selected by him and his fellow commissioners but that he did not know the racial background of some of the other grand jurors at the time of their selection.

Commissioner Spencer testified that he was told by a fellow commissioner that Clarence Jackson was a member of the colored race and that his five selections for the grand jury were intimate acquaintances of his whom he knew to be so situated in business that they might spare three months to serve.

C. F. Starks, a member of the colored race, testified that he had served on the grand jury about ten years ago and that frequently since that time the Dallas County jury commissioners had called upon him for advice in the selection of members of the colored race for grand jury service. Appellant contends that the aid which the commissioners got from Mr. Starks was unofficial and illegal. It would seem to us, rather, that the commissioners were attempting to comply with the mandate of the Supreme Court of the United States in Cassell v. Texas, 339 U. S. 282, wherein the Court said:

"Their responsibility was to learn whether there were persons among the Negroes they did not know who were qualified and available for service."

Appellant's second motion to quash the indictment is predicated upon the contention that the jury commissioners failed to sign their names across the flap of the manila envelope containing the grand jury list before they delivered it to the judge in open court. From the testimony of the two jury commissioners who testified at the hearing on the motion, it is apparent that when first questioned one of them forgot having written his name across the back of the envelope but was called back the following day and testified that he had done so.

Bill of Exception No. 3 is directed to the testimony of Henry Wade, district attorney, in which mention is made of a lie detector test having been given the appellant. It is unnecessary to discuss the details of how this evidence got before the jury during the course of Mr. Wade's testimony because the same testimony was admitted, without objection, while the appellant was testifying in his own behalf.

Bill of Exception No. 4 complains of argument of the prosecutor in which he stated the deceased was at the time of her demise making a living for a 4-year-old boy and for her husband who was a tubercular in a hospital. Appellant's complaint is that this argument was outside the record. We shall examine this contention. Mrs. Parker's employer testified that she was regularly employed by him in the toy department and that her hours were from 12:00 noon until 9:00 p.m. Mrs. Parker's mother testified that since the death of her daughter she had been keeping her son, who was five years old at the time of the trial, and that Mr. Parker was in the T. B. Hospital. We agree with the trial court that the argument was a reasonable deduction from the evidence.

Bill of Exception No. 5 complains that appellant's trial was halted so that the court might sentence one Klinedinst to death. The court's qualification of the bill and the evidence adduced in support of the bill shows that no prospective juror was in the courtroom at the time Klinedinst was sentenced. There is no showing that any member of the panel who may have been in the corridor at the time Klinedinst was escorted to and from the courtroom knew who he was or the reason for his visit to court, nor did the appellant question them about the incident. The bill does not reflect error.

Bill of Excepion No. 6 complains of the testimony of Officer Gallaher set forth earlier in this opinion. The statement was clearly res gestae. Appellant's contention that it was incumbent upon the state to prove that Mrs. Parker was competent and in full possession of her faculties at the time she made the statement is inconsistent with a long line of decisions of this court which hold that a res gestae statement is admissible even though the person who made it is incompetent as a witness. See Haley v. State, 157 Tex. Cr. Rep. 150, 247 S. W. 2d 400; Jones v. State, 238 S. W. 2d 529; and Heflin v. State, No. 27,352, 161 Tex. Cr. Rep. 41, 274 S. W. 2d 861.

Bills of Exception Nos. 7 and 8 are directed to the court's charge. In his brief the appellant says, "The court, by such provision of the charge, permitted the jury to find that the appellant signed the purported confessions from a preponderance of the evidence, and they were not required to believe that he signed it or find that he signed it from the evidence beyond a reasonable doubt." Without analyzing whether appellant's contention is well taken, we observe that the appellant admitted that he signed both confessions and that each bore his genuine signature. It thus follows that no issue was raised as to the actual execution of the confessions, and no harm could have resulted if the charge assumed that it had been executed by the appellant.

Bill of Exception No. 9 is directed to the admission of the confessions. It is appellant's contention that, since the officers had no warrant for the appellant's arrest, any confession which they secured from him would be inadmissible because of the unlawful arrest. We had a similar contention before us in Head v. State, 160 Tex. Cr. Rep. 42, 267 S. W. 2d 419. There we said:

" . . . the appellant has confused illegal arrest and illegal detention following arrest. It is the detention and not the arrest

which this Court and the Supreme Court of the United States hold under some circumstances vitiates a confession."

Appellant contends that the amendment of Article 727a, V.A.C.C.P., by the 53rd Legislature is controlling here because of the addition of the words "or laws of the United States." He cites no Federal statute but relies upon Rule 5 of the Federal Rules of Criminal Procedure as promulgated by the Supreme Court of the United States, which provides that the arresting officer shall take the person arrested forthwith before a commissioner. We must hold that the phrase "laws of the United States" applies to acts of Congress and not judicial rules or decisions.

It has been the consistent holding of this court, and of the Supreme Court of the United States in passing on state court cases, that the rule in McNabb v. U. S., 87 L. Ed. 819, does not apply and that the failure to take an accused forthwith before a magistrate does not in itself standing alone vitiate a confession. Dimery v. State, 156 Tex. Cr. Rep. 197, 240 S. W. 2d 293; Gallegos v. Nebraska, 342 U. S. 55, 72 S. Ct. 141, 96 L. Ed. 86; Shook v. State, 156 Tex. Cr. Rep. 515, 244 S. W. 2d 220; Leviness v. State, 157 Tex. Cr. Rep. 160, 247 S. W. 2d 115; Golemon v. State, 157 Tex. Cr. Rep. 534, 247 S. W. 2d 119 (writ of certiorari denied); Gasway v. State, 157 Tex. Cr. Rep. 647, 248 S. W. 2d 942 (writ of cretiorari denied); Paris v. State, 157 Tex. Cr. Rep. 580, 249 S. W. 2d 217 (writ of certiorari denied); Hulen v. State, 157 Tex. Cr. Rep. 507, 250 S. W. 2d 211; Stroble v. California, 343 U. S. 181, 72 S. Ct. 599, 96 L. Ed. 872; Stein v. N. Y., 346 U. S. 156, 73 S. Ct. 1077, 97 L. Ed. 1522.

Bill of Exception No. 10 complains of the admission of the second confession to Millard Sweatt and Henry Wade on the grounds that there was no showing that Henry Wade had given the appellant any warning. The confession states on its face that it was made to Millard Sweatt, who had warned the appellant. Sweatt testified that he gave the warning. Appellant relies upon Grice v. State, 115 Tex. Cr. Rep. 64, 29 S. W. 2d 793. In that case we held a confession made after the accused had been warned by "the grand jury" was not admissible. Such holding does not find application here. What the statute requires is that some named individual give the warning and that the confession be made to him. This requirement has been met in this case.

Bill of Exception No. 11 relates to appellant's motion to sup-

press the confessions. Such a motion is not a part of the procedure recognized in this jurisdiction. Dominguez v. State, No. 27,248, 161 Tex. Cr. Rep. 124. We will, however, examine closely all the evidence which relates to the voluntary nature of the confessions. We do this in every case.

Appellant claimed no brutality or long and uninterrupted questioning. He did claim that prior to being interrogated by Captain Fritz he had seen some officers, one of whom was wearing a gun, slap another prisoner in the jail. He stated that Captain Fritz insisted that he was guilty and, when he denied his guilt, that Fritz said he was calling him a liar and told him he would call in two men from upstairs. He denied that he had told Captain Fritz that he had sold the knife to a boy for thirty-five cents, which statement was incorporated in the confession. He stated that Sweatt had told him that Henry Wade was the only person in the world who could help him and that Wade told him he wanted a confession for his files and that he would not ask the jury for the electric chair and that there were present when he made the second confession some of the officers whom he had seen whip the prisoner.

Each of the persons named was called in rebuttal and denied that portion of appellant's testimony set forth above. There is, therefore, no undisputed fact in this record that would render the confessions inadmissible.

The final bill relates to the court's failure to grant a continuance because of the absence of a material witness. The court qualified the bill and certified that the witness named in the motion was produced in court, and though made available to the accused, was not called as a witness.

Finding no reversible error, the judgment of the trial court is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING

DAVIDSON, Judge.

Appellant insists that we were in error in overruling his contention that racial discrimination was practiced against members of the Negro race in the selection and organization of the grand jury that returned the indictment in this case.

In deference to this insistence, we have again reviewed the

testimony touching this question and remain convinced that a correct conclusion was reached originally.

We can but add to what we said originally the observation that in our opinion this record reflects that the grand jury commissioners, in drawing the instant grand jury, fairly and honestly performed the duties incumbent upon them not to discriminate against any race, nationality, creed, or class entitled to be given recognition or consideration in the drawing thereof.

It must be remembered that the guarantee of the Fourteenth Amendment against discrimination in the organization of a grand jury is not limited or restricted to members of the different races but extends to and includes all classes and groups which, by reason of some special condition or fact situation, are established in the particular county or community. Hernandez v. Texas, 347 U. S. 475, 98 L. Ed. 866, 74 S. Ct. 667.

It follows, therefore, that in the drawing and selection of a grand jury in this state all races, nationalities, and established classes are entitled to the same treatment and consideration in order that discrimination not be practiced against the members of any particular group or as between the several classes which are entitled to the same protection against discrimination.

Under the facts here presented, we are unable to arrive at the conclusion that members of the Negro race were discriminated against because of their race in the organization of the instant grand jury.

Appellant's challenge of the correctness of our conclusion that that part of Art. 727a, Vernon's C. C. P., which includes the "laws of the United States" has reference only to the act of Congress has given us much concern.

In support of his contention that Federal rules of criminal procedure are laws of the United States, appellant calls to our attention the fact that Congress conferred upon the United States Supreme Court the power to promulgate rules of procedure governing the trial of criminal cases in the Federal courts (Title 18, Sec. 3771, Chap. 237) and also that there is express Federal authority for the conclusion that a rule so promulgated under the power of and not vetoed by Congress has all the force and effect of a statute or law of the United States. Barkman v. Sanford, 162 F. 2d 592; Rattley v. Irelan, 197 F. 2d 585.

Upon further consideration, we have concluded that a determination of the question as to whether Federal rules of procedure are laws of the United States within the meaning of Art. 727a, Vernon's C. C. P., is not necessary inasmuch as we have reached the conclusion that this case, under the facts presented, is governed by the rule announced by us in Dimery v. State, 156 Tex. Cr. R. 197, 240 S. W. 2d 293, to the effect that a failure to carry an accused before a magistrate vitiates a confession only when there is some casual connection between the failure to carry him before a magistrate and the making of the confession. We are unable to find from this record sufficient evidence to call for an application of the rule stated.

Accordingly, the facts before us do not warrant the conclusion that the confessions of appellant resulted from the failure of the arresting officer to carry him before a magistrate.

We remain convinced that reversible error is not reflected.

Appellant's motion for rehearing is overruled.